In re Donald DUPREE and
Rita Dupree, Debtors.

Donald DUPREE and Rita
Dupree, Plaintiffs,

v.

LOMAS MORTGAGE USA, INC., a Texas Corporation, and American General Finance, Inc., an Oklahoma Corporation, Defendants.

Bankruptcy No. BK–91–03378–LN.
Adv. No. 95–1050–LN.

United States Bankruptcy Court,
W.D. Oklahoma.

June 16, 1995.

Patrick E. Moore, Kenneth C. McCoy, Oklahoma City, OK, for plaintiffs/debtors.

Mark Kuehling, Oklahoma City, OK, for defendant Lomas Mortg. USA, Inc.

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

PAUL B. LINDSEY, Chief Judge.

On May 10, 1991, debtors filed their voluntary petition under Chapter 13 of the Bankruptcy Code.[1] Now, more than four full years later, this court is being asked to nullify what is perhaps the primary result accomplished by debtors in their successfully completed Chapter 13 plan.

### BACKGROUND

Debtors executed a mortgage on their homestead in December 1982, with Lomas Mortgage USA, Inc., ("Lomas") as mortgag-

---

1. References herein to statutory provisions by section number alone will be to the Bankruptcy Code of 1978, 11 U.S.C. §§ 101–1330, unless the context requires otherwise.

ee. Together with their petition, debtors filed their Chapter 13 plan, and a motion under § 506 seeking an order determining the value of Lomas' secured claim, and voiding a portion of Lomas' lien.[2] On June 6, 1991, Judge John TeSelle, to whom the case was then assigned, entered his Order Determining Value of Secured Claims and Avoiding Liens, in which the value of debtors' residence was found to be $31,000, Lomas was held to have an allowed secured claim in that amount, American General Finance ("American General"), the holder of a second mortgage lien, was held to have no allowed secured claim, and Lomas and American General were held to have allowed unsecured claims in the respective amounts of $12,825.03 and $13,339.95.

The order concluded with the following:

IT IS FURTHER ORDERED that to the extent that a lien of an above named Creditor secures a claim against the Debtors that is not an allowed secured claim and upon payment by the Debtor [sic] of the amount of the allowed secured claim together with appropriate interest, such lien IS HEREBY ORDERED void and the said Creditor shall immediately and forthwith release said lien to the extent said lien is unsecured.

On August 5, 1991, the court entered its order confirming debtors' plan. No objection had been raised to the confirmation. On July 20, 1994, the Trustee filed her Final Account, showing that debtors had completed their plan.

Debtors thereafter sought from Lomas the release of its lien on their homestead, to the extent the lien exceeded $31,000, less any principal payments received during the pendency of the Chapter 13 case. Lomas refused, simply stating that the principal balance of the mortgage loan at that time, November 17, 1994, was $41,906.80.

In November, debtors filed a quiet title action in Oklahoma County District Court against Lomas and American General. Debtors also contended that American General had wrongfully refused to release its lien as requested. Lomas removed the action to the United States District Court for the Western District of Oklahoma, in which an order was entered referring the case to this court. By stipulation between the parties, American General was dismissed from the proceeding with prejudice.

## CONTENTIONS OF THE PARTIES

### DEBTORS.

Debtors first contend that "The *Nobelman* [sic] decision does not authorize Lomas to now litigate the issue of lien avoidance under Section 506(D) [sic]," referring to *Nobelman v. American Savings Bank,* —— U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), and to § 506(d).[3] Debtors rely for this proposition upon this court's decision in *In re Moretti,* 172 B.R. 984 (Bankr.W.D.Okla.1994).

Debtors next contend that "The bankruptcy court's order determining value and avoiding lien, order confirming debtor's [sic] plan and order discharging debtors are res judicata as to Lomas' asserted defenses." For this proposition, debtors rely upon two unpublished opinions of this court: *In re Littrel,* No. BK–92–10025–LN (Bankr.W.D.Okla., Order dated September 30, 1993); and *In re Martin,* No. BK–92–18336–LN (Bankr. W.D.Okla., Order dated December 13, 1993).

### LOMAS.

In response, Lomas first states that it is not contending that *Nobelman* should be given retroactive effect. It asserts, however,

---

2. Section 506(a) and (d), insofar as they are germane to the issues before the court in this case, provide: (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim....

. . . .

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void....

3. This order will contain references to the lower court decisions in the *Nobelman* case. References hereafter to *"Nobelman"* alone, however, will be to the Supreme Court decision in *Nobelman v. American Savings Bank,* unless the context requires otherwise.

that the terms of debtors' confirmed plan are ambiguous and do not clearly provide for the modification of the lien rights of Lomas, and that therefore the interpretation of the plan urged by the debtors would constitute the taking of property of Lomas without due process of law. For this latter proposition, Lomas relies upon *Reliable Electric Co., Inc. v. Olson Construction Co.*, 726 F.2d 620 (10th Cir.1984) and other authorities.

Lomas challenges the service of debtors' § 506 motion, as not being in compliance with the Local Bankruptcy Rules or the Federal Rules of Bankruptcy Procedure. Lomas contends that debtors' plan did not provide for the stripping down of Lomas' lien. Lomas concedes that it did not file an objection to the plan, since it interpreted the plan as providing for the full payment of the claim outside the plan.

Lomas next contends that it filed its proof of claim, to which no objection was ever filed, and that this court's order confirming debtors' plan makes no reference to bifurcation or stripping down of Lomas' lien.

Lomas urges that in the absence of proper service of the § 506 motion, the order entered pursuant to it is void. Further, it is urged that since the motion was filed and served on the date the petition was filed, before official notice of the filing of the petition was given, Lomas was not provided notice reasonably calculated under all the circumstances to apprise it of the pendency of the action and afford it the opportunity to present an objection. It concludes that "[e]ven if Lomas had received a copy of the motion, without prior notice of the bankruptcy it would not have an open bankruptcy file and no reason to be concerned that its rights were subject to being modified." Lomas also contends that it did not stipulate that the value of the property was $31,000, as was recited in the order submitted by counsel to debtors and entered by Judge TeSelle.

With regard to debtors' contention that the terms of the confirmed plan are controlling under principles of *res judicata*, Lomas responds, relying upon *In re Howard*, 972 F.2d 639 (5th Cir.1992); *In re Simmons*, 765 F.2d 547 (5th Cir.1985); and *In re Linkous*, 990 F.2d 160 (4th Cir.1993), for the proposition

that debtors must object to a timely filed claim in order to avoid its being deemed allowed as filed, and that the terms of a duly confirmed plan will not prevail over such a claim to which no objection has been interposed.

### DEBTORS (In Reply)

Debtors reply by contending that "Lomas participated in debtors' bankruptcy and is bound by the debtors' bankruptcy plan and orders of the court" and that "Lomas received notice reasonably calculated to apprise it of the need to protect its mortgage."

## DISCUSSION

This case raises several issues which are of importance in Chapter 13 jurisprudence. One of those issues is whether procedurally defective service of a motion for valuation pursuant to § 506(a) renders null and void an order subsequently entered pursuant to the motion after respondent's default. Another issue is whether in this case, debtors' Chapter 13 plan afforded Lomas reasonable notice that its rights were subject to being adversely affected. Finally, and arguably most significant, are the issues of whether the terms of a confirmed plan modifying the rights of a secured creditor can be binding on that creditor if the creditor has timely filed its proof of claim and debtors have not objected to it, and if so, whether such is the case here.

### Preliminary Comments.

Initially, this court feels compelled to point out an assertion of Lomas which it considers to be, at best, disingenuous.

In Lomas' response to debtors' motion for summary judgment, the following appears in support of Lomas' argument in support of the primacy of its proof of claim over the provisions of the confirmed plan:

> This is not a situation involving a "sophisticated lender" that should be knowledgeable in this area and held to a higher standard. At the time this plan was confirmed, Lomas serviced loans all over the United States. During this time, there was a wide diversity of opinion regarding whether the strip down of liens was even permissible under the Bankruptcy Code.

Leaving aside the question of how a large, nationally well known entity which "serviced loans all over the United States" could be other than a sophisticated lender, the court addresses Lomas' assertion that a wide diversity of opinion existed with regard to bifurcation and lien-stripping.

On October 4, 1989, the Ninth Circuit Court of Appeals decided *Hougland v. Lomas & Nettleton Co. (In re Hougland)*, 886 F.2d 1182 (9th Cir.1989). In that case, the court construed the § 1322(b)(2) prohibition of modification of the rights of holders of certain claims secured solely by a security interest in real property which is the debtor's principal residence.[4] It was held that the prohibition applied only to the extent of the allowed secured claim, and that under § 506(a), the allowed claim was a secured claim to the extent of the value of the collateral and an unsecured claim to the extent of the balance. Thus, it was held that the prohibition did not operate to prevent modification of the unsecured portion of an undersecured claim, and bifurcation and lien-stripping of undersecured residential mortgage claims were therefore authorized. The defendant in that case, Lomas & Nettleton Co., is believed to have been, if not the same entity as the Lomas herein, either its predecessor or an affiliate. In any event, it is inconceivable that Lomas was not aware of the decision, which received widespread publicity in bankruptcy publications.

On February 9, 1990, the Third Circuit Court of Appeals decided *Wilson v. Commonwealth Mortgage*, 895 F.2d 123 (3rd Cir. 1990), following *Hougland* and also citing 5 *Collier on Bankruptcy*, ¶ 1300.73[4] at 1300–148; ¶ 1322.06 at 1322–15 (L.King 15th ed. 1989), to the same effect.

On January 17, 1991, the Tenth Circuit Court of Appeals decided *Eastland Mortgage v. Hart (In re Hart)*, 923 F.2d 1410 (10th Cir.1991), following *Hougland* and *Wilson*. On February 26, 1991, the court of appeals denied rehearing in *Hart*. This court, which sits within the Tenth Circuit, is of course bound to follow the rulings of the Tenth Circuit Court of Appeals, as Lomas is well aware.

It may be seen from the foregoing that when debtors herein filed their petition, on May 10, 1991, the only court of appeals authority on the issue of bifurcation and lien-stripping of undersecured residential mortgages in Chapter 13 were *Hougland, Wilson* and *Hart*, each of which held that the unsecured portion of an undersecured residential mortgage could be modified in Chapter 13 notwithstanding the prohibition contained within § 1322(b)(2).

On April 21, 1992, the Second Circuit Court of Appeals decided *In re Bellamy*, 962 F.2d 176 (2nd Cir.1992), and became the fourth circuit to authorize modification of the unsecured portion of an undersecured allowed home mortgage claim, following *Hougland, Wilson* and *Hart*.

Not until August 13, 1992, more than one year after debtors' Chapter 13 plan was confirmed herein, was a dissenting voice heard at the court of appeals level. On that date, the Fifth Circuit Court of Appeals decided *Matter of Nobelman*, 968 F.2d 483 (5th Cir. 1992), in which it reached the contrary result, affirming a district court decision entered on June 24, 1991. *See In re Nobelman*, 129 B.R. 98 (N.D.Tex.1991). On December 7, 1992, the Supreme Court granted a writ of certiorari (—— U.S. ——, 113 S.Ct. 654, 121 L.Ed.2d 580), and on June 1, 1993, *Nobelman v. American Savings Bank*, —— U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) ("*Nobelman*") was decided, affirming the Fifth Circuit Court of Appeals and overruling the four courts of appeals decisions which had previously held to the contrary. The *Nobelman* court stated that bifurcation, i.e., valuation of the property under § 506(a) in order to determine the amount of the secured and unsecured claim of Lomas, was permissible. It disagreed, however, with the earlier court of appeals interpretations of the language in § 1322(b)(2). Instead, it focused on the "rights of holders" language, and declined to limit that language to the secured portion of the allowed claim. Thus, it was held that

---

4. Section 1322(b)(2) provides, in material part, that a Chapter 13 plan may modify the rights of holders of secured claims, *other than a claim* *secured only by a security interest in real property that is the debtor's principal residence.*

§ 1322(b)(2) prohibited modification of any of the rights of the holder of an allowed secured home mortgage claim, even though a portion of the total claim may have been determined to be unsecured.

It is interesting to note that three days before the writ of certiorari was granted in *Nobelman,* on December 4, 1992, the Ninth Circuit Court of Appeals decided *Lomas Mortgage USA v. Wiese,* 980 F.2d 1279 (9th Cir.1992), in which it reaffirmed its earlier decision in *Hougland.*

The foregoing chronology makes it clear that Lomas could not have had any significant doubt as to the state of the law on the residential lien-stripping issue, in this circuit as well as elsewhere, prior to the confirmation of debtors' Chapter 13 plan herein or thereafter. It was permitted in all circuits which had decided the issue until *Matter of Nobelman* was decided by the Fifth Circuit Court of Appeals on August 13, 1992.[5] Lomas must also have been well aware that lien-stripping continued to be permissible in the Tenth Circuit, in accordance with the *Hart* decision, until June 1, 1993, when *Nobelman* was decided by the Supreme Court.

### The § 506 Motion and Order.

■ Lomas complains that service was faulty on debtors' § 506 motion, since it was mailed to Lomas at a post office box utilized by Lomas for the receipt of monthly payments, without naming an officer or other agent, as prescribed by Rule 7004(b)(3), Fed. R.Bankr.P. Lomas asserts that the service was procedurally defective, and, without citation of authority, that the order obtained pursuant to it was therefore "of no force or effect." In a perfect world, mortgagors might be aware of the proper corporate address of their mortgagee, together with the name of one of its officers or agents. In the real world, however, the only address which is known to the vast majority of mortgagees is the address to which they are required to mail their monthly payments.

■ Lomas complains that even if it had received a copy of the motion, it would not have had at that time an open bankruptcy file, and therefore would have had no reason to be concerned that its rights were subject to being modified. In this court's view, the receipt by a creditor of a motion to value the creditor's claim, secured by residential real estate, bearing a heading, caption and file number of a United States Bankruptcy Court, would provide a full measure of reasons for that creditor to be concerned that its rights were subject to being modified.

Further, Lomas at no time contends that the motion was not received. It is noted that debtors' Chapter 13 plan, filed with their petition and concurrently with their § 506 motion, was mailed to all creditors on May 13, 1991; that the notice of bankruptcy and of first meeting of creditors was mailed by the clerk of this court to all creditors on May 16, 1991; and that the order obtained from Judge TeSelle pursuant to the § 506 motion was mailed to Lomas and the other respondent named in that motion on June 10, 1991. Each of these mailings to Lomas was made to the address shown on debtors' mailing matrix; the same post office box to which the § 506 motion was mailed. Lomas does not contend that any or all of these other mailings was not received, or that Lomas was somehow disadvantaged by their having been mailed to an address other than that which would have been called for by strict application to the bankruptcy rules.

On or about July 11, 1991, Dallas, Texas counsel for Lomas provided counsel for debtors with a copy of Lomas' proof of claim, and on or about July 15, 1991, that counsel filed a request for the service of notice in debtors' bankruptcy case. It is noted that counsel for Lomas made no request that the address shown for Lomas on the mailing matrix be changed, in their letter to counsel for debtors or in their entry of appearance or in the original or a later amended request for notice. Neither does Lomas contend that its counsel did not have an opportunity to review the entire bankruptcy file and thus obtain knowledge of all which had transpired since the filing of the case. The order confirming

5. This court is aware that bankruptcy courts sitting in circuits in which the issue had not been decided at the court of appeals level were split on the issue. It is believed, however, that the numerical weight of authority in those courts also favored permitting lien-stripping.

debtors' Chapter 13 plan was filed three weeks after counsel filed its request for service of notices, on August 5, 1991, and was mailed to Lomas at the same post office box address as well as to counsel.

■ In this court's view, actions taken and documents filed and served in debtors' bankruptcy case between the May 10, 1991, date of its filing and the July 15, 1991 date on which counsel for Lomas requested that they be served with notices, are just as valid and binding upon Lomas as are actions taken and documents filed and served thereafter. Lomas has at no time contended that it did not receive any of the aforementioned documents, or that its counsel did not have an opportunity to review the entire court file prior to the confirmation of debtors' Chapter 13 plan. Lomas' counsel could have interposed objections to any actions taken on a timely basis after entering the case, and before confirmation of debtors' Chapter 13 plan, but did not do so. Instead, Lomas did nothing at that time, waited more than three years, allowing debtors to make all their plan payments and all mortgage payments to Lomas, to complete their plan and obtain their discharge, before challenging the validity and effect of the court's actions.

In this court's opinion, the June 10, 1991 order of Judge TeSelle, having never been challenged during the more than three years after its entry until this action was commenced, was and is valid, and is not subject to collateral attack at this very late date. As will be seen hereafter, even if that order had been found to be deficient, Lomas would nevertheless be barred by principles of *res judicata* from collaterally attacking the provisions of debtors' confirmed Chapter 13 plan, the confirmation of which was at no time objected to, challenged or appealed from.

### The Chapter 13 Plan.

In debtors' original petition, filed May 10, 1991, Lomas is scheduled as the holder of the first mortgage on debtors' home, showing the "Amount of claim without deduction for value

of security" as $43,825.03, and the "Market Value" as $31,000.

In debtors' Chapter 13 plan, filed concurrently with their petition, secured claims are included in Class 4. Paragraph 4.a. relates to real estate mortgages secured solely by the debtors' principal residence, and paragraph 4.a.(I) deals with monthly mortgage payments, in part, as follows:

> All mortgage holders, except as avoided by Section 522(f) election, shall retain their lien on the real estate, to the extent allowed secured pursuant to 11 U.S.C. Section 506(a) & (d), until such time as the amount shown as "Secured Value" under paragraph 4.a.(iii), unless the Court allows the claim as secured in a different amount and in that event to the amount so allowed, plus interest at the contract rate shall have been fully paid either during or after completion of this Plan, at which time the mortgage lien shall be voided and Debtors shall retain the real estate free and clear of said mortgage lien(s).

Paragraph 4.a.(iii), referred to in paragraph 4.a.(i), deals with payment of listed mortgage holders. That paragraph shows Lomas' mortgage as having a "Secured Value" of $31,000, to be current, and to call for a monthly mortgage payment of $542, to be paid by debtor.[6]

Paragraph 4.d. is entitled "Payments of Allowed Secured Claims," and is in its entirety as follows:

> Payment of amount allowed as secured, with interest where called for by this Plan, shall constitute full satisfaction of the obligation supporting the lien that the creditor holds on Debtors' property which property shall then be free and clear of said lien.

Debtors' plan, under "General Provisions," includes in paragraph 7 an explanation of the treatment of undersecured claims, which in its entirety is as follows:

> The allowed unsecured amount of an undersecured claim will be the difference, if any, between the amount of the claim as

---

6. The practice of the Chapter 13 trustee in this district has been to allow mortgage payments to be paid by debtors outside the Chapter 13 plan when debtors are current in their obligations to the mortgagee. Where debtors are in arrears on those obligations, however, the trustee has required that the arrearages be cured, and ongoing payments be made through the trustee.

set forth on a timely filed secured Proof of Claim and the value of the collateral as set forth in this Plan or any subsequent Order or Agreed Stipulation, without prejudice to the Debtors' right to object to such filed claim at any time prior to the completion of all payments provided for under this plan by the Debtors.

■ The order confirming debtors' plan contains a single reference to Lomas' claim, as follows: "Lomas Mortgage (1st Mortgage)—to be paid directly by the debtor." This language was included in a portion of the order dealing with payments by the trustee to special claimants, including support, collateral to be surrendered and the like. The reference would have been more appropriately included under "other provisions of the plan," and could have been made more clear had it made specific reference to the bifurcation of the claim and to the amounts of the allowed secured and allowed unsecured claims, as determined pursuant to § 506(a).

Even so, given the clear and unequivocal provisions of the plan itself, however, and particularly in light of the earlier order determining the value of the secured claim as provided for in the plan, setting out the value of the unsecured claim, and ordering the release of the lien to the extent that it was unsecured, Lomas' contention, that it was unaware until this action was filed that debtors intended to bifurcate its claim and avoid the lien on the unsecured portion of the claim, is simply not credible. The failure of the order confirming the plan to restate all that had gone before, or to repeat the language of the plan itself, does not change this court's conclusion in that regard.

### Proof of Claim vs. Confirmed Plan.

This court has been informally told on numerous occasions by counsel for mortgage creditors, including counsel herein, that the issue of lien avoidance pursuant to lien-splitting plans confirmed prior to *Nobelman* would be raised again after those plans had been completed. Lomas' refusal to acknowledge the fact or the validity of the actions taken in this case pursuant to the order on debtors' § 506 motion and pursuant to their confirmed Chapter 13 plan is apparently Lomas' way of raising that issue.

As is noted above, Lomas' position is that debtors' confirmed Chapter 13 plan can have *res judicata* effect as to a creditor only if the debtor has filed an objection to the creditor's timely-filed proof of claim, and that in the absence of such an objection, the creditor may rely upon its lien and not participate further in the bankruptcy proceeding. For that proposition, Lomas relies upon *In re Simmons*, 765 F.2d 547 (5th Cir.1985); *In re Howard*, 972 F.2d 639 (5th Cir.1992); and *In re Linkous*, 990 F.2d 160 (4th Cir.1993).

In *Simmons*, a creditor filed a secured proof of claim, and objected to debtor's scheduling of its claim as unsecured. The creditor did not object to confirmation of debtor's plan, his status as contained in the schedules was not corrected, and the plan was confirmed. The court of appeals held that a Chapter 13 plan may not substitute for an objection to a secured creditor's proof of claim, and that a secured creditor is therefore not bound by a plan which purports to reduce its claim where no objection has been filed.

In *Howard*, debtors owed a mortgage creditor some $4,600. Debtors scheduled the debt as disputed, and also scheduled an action brought by debtors against the creditor as an asset. Debtors' Chapter 13 plan proposed to pay the creditor a total of $500 of the secured debt, representing an offset of the compromised amount of debtors asserted claim against the creditor, and provided that the creditor's lien would be lifted upon such payment. The creditor received notice of the filing of the petition, of the creditors' meeting and of the confirmation hearing. At no time, however, did it receive a copy of the plan or any actual notice that its claim was proposed to be compromised down to $500. The plan summary received by the creditor simply recited the monthly plan payments and a statement that all unsecured claims would be paid over the 36–month plan term. The creditor timely filed its proof of claim prior to the confirmation hearing, and debtors did not file an objection to it. The creditor did not participate in the confirmation proceedings and the plan was confirmed. When the

creditor did not receive the payments it expected, it filed a motion for relief from the automatic stay in order to foreclose on its mortgage.

The bankruptcy court and the district court in *Howard* denied relief, holding that the confirmed plan was *res judicata* to the issues raised in the motion because the creditor had failed to object to the plan prior to confirmation. The court of appeals reversed, relying upon *Simmons.*

In *Howard,* debtors relied upon *Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987), arguing that the confirmation of a plan is *res judicata* against the creditor who does not object to its confirmation. In *Shoaf,* the bankruptcy court confirmed a plan which invalidated a guaranty given by a third party in favor of a creditor of the debtor. The creditor had objected to the provision at one hearing, but failed to object, to the provision or to confirmation of the plan, at the final confirmation hearing. Even though the bankruptcy court did not have the statutory authority to invalidate the guaranty, the court of appeals held, citing *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938), that the plan confirmation was *res judicata* on the issue of the validity of the plan provision which effected the invalidation.

The *Howard* court recognizes the tension between *Simmons* and *Shoaf,* and notes that if the cases were in conflict, the court would be bound to follow *Simmons* as the earlier decision of the court on the subject. The court, however, distinguishes the two cases, noting that the creditor in *Shoaf* was not a secured creditor. The court refers to the concept that a secured creditor with a lien may ignore the bankruptcy proceeding and look to the lien for satisfaction of the debt, quoting *Simmons* and *In re Tarnow,* 749 F.2d 464 (7th Cir.1984). It then states:

> In other words, a secured creditor may remain outside the bankruptcy proceedings until an interested party objects to his allowed secured claim. This right to stay outside the bankruptcy process by relying solely on the value of one's lien would be meaningless, however, if the creditor's claim can be compromised away without

further notice and he is bound by that compromise. Strict adherence to the requirement that an objection be filed to challenge a secured claim is necessary to protect this important interest under the Code.

*Howard,* 972 F.2d at 641.

The court concludes that *Simmons* "represents a limited exception to the general rule of *Shoaf* based upon the competing concerns expressed in the bankruptcy code." *Id.*

In *Linkous,* debtor scheduled secured debts owed to a single creditor in the amounts of $18,000 and $4,000. Based upon debtor's estimated fair market value of the collateral securing these debts, the Chapter 13 plan treated these debts as secured only to the extent of $6,000 and $1,000, respectively, and treated the remainder of each as unsecured. The creditor received a summary of the plan, which stated that a $100 per month payment would be made by the trustee to the creditor on the first claim. The summary made no mention of the second claim, and did not state that the secured claims would be treated as only partially secured.

Notice of the meeting of creditors and of a confirmation hearing was mailed to all creditors. The secured creditor did not appear at either the meeting of creditors or the confirmation hearing. No objections were raised to confirmation of the plan, and it was confirmed.

Later, the creditor filed its secured proofs of claim, presumably on a timely basis, and its motion seeking revocation of the order confirming the plan and dismissal or conversion of the case. The bankruptcy court denied the motions, holding that the creditor had failed to protect its interests and that it was too late to challenge the confirmation. The district court vacated the confirmation order insofar as it affected the secured creditor's claims, based upon inadequacy of notice. A divided panel of the court of appeals affirmed the district court's order, holding that while a bankruptcy court confirmation order. is generally treated as *res judicata,* "we cannot defer to such an order on *res judicata* grounds if it would result in a denial of due

process in violation of the Fifth Amendment of the United States Constitution." *Linkous,* 990 F.2d at 162. The court then referred to *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), in which the following appears:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

The *Linkous* court quoted *In re Calvert,* 907 F.2d 1069 (11th Cir.1990), to the effect that mere notice that the bankruptcy court would hold a confirmation hearing on a proposed bankruptcy plan, without inclusion of notice specifically directed at the security valuation process, did not satisfy the requirement of Rule 3012, Fed.R.Bankr.P.[7] It then quoted *Mullane* as stating that in order to satisfy due process requirements, "the notice [of the proceedings] must be of such nature as reasonably to convey the required information." The information required to be conveyed to the creditor in *Linkous* was that the court would hold a § 506 valuation hearing in conjunction with the confirmation hearing, and the notice to the creditor in that regard was held to have been constitutionally inadequate. The district court's order vacating the confirmation order only with respect to the secured creditor was therefore affirmed. *Linkous,* 990 F.2d at 162–163.

The *Linkous* court notes that creditors are expected to take some responsibility in the bankruptcy process or risk the loss of their rights, citing *Matter of Pence,* 905 F.2d 1107 (7th Cir.1990). The court continued as follows:

> However, notwithstanding the recognized responsibilities of the creditor, the debtor also must meet certain burdens. A debtor should inform the *secured* creditor of an intent to reclassify its claim into partially secured and partially unsecured status. Placing such a responsibility with the debt-

or is both logical and not unduly burdensome.

*Linkous,* 990 F.2d at 163.

This court finds curious the reliance by the *Howard* court upon *Tarnow* and its reference to the line of cases permitting a secured creditor to ignore the bankruptcy proceeding and look to its lien for satisfaction of the debt. In this court's view, *Tarnow* and the authorities cited by it refer to a creditor remaining completely outside the bankruptcy proceeding. In *Howard,* however, the court seems to indicate that a creditor may remain outside selected portions of the bankruptcy proceeding; that it may file a proof of claim, but ignore the confirmation process unless an objection is filed to its proof of claim, as is required by *Simmons.* To this court, such a position is illogical, as well as administratively unwieldy. The thrust of *Simmons,* and of *Howard,* is that once a creditor is put on notice that debtors propose to adversely affect its rights, it must participate in the proceeding if it wishes to protect those rights. This court fails to see, and neither of those cases makes clear, why an objection to a proof of claim should be the only possible vehicle through which such notice may be given to a creditor.

■ While court of appeals decisions in other circuits are entitled to considerable weight, they are not binding upon this court. This court has not been directed to, and has not found, any court of appeals authority on this point in the Tenth Circuit, but has had occasion to address the issue itself on at least one occasion.

In *In re Martin,* No. BK–92–18336–LN (Bankr.W.D.Okla., Order entered December 13, 1993), debtor's Chapter 13 plan was confirmed by order dated April 26, 1993, without objection, after a hearing at which no creditor appeared. On May 5, 1993, less than ten days after the order confirming the plan was entered, a secured creditor filed an objection to confirmation of the plan, based solely upon its objection to debtors' valuation of the

---

7. Rule 3012 permits the court to determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other person the court may direct.

property securing the debt. The creditor did not appeal the order confirming the plan.

On July 16, 1993, the creditor filed a motion requesting that the court determine the value of the property under § 506(a), and that the court "clarify the effect of the confirmation order on the creditor's lien on the debtors' principal residence and determine [that] its rights under the original note and mortgage and its lien have not been modified by the confirmation order in this case." The quoted language is significant, because *Nobelman* was decided by the Supreme Court on June 1, 1993, and the creditor obviously sought to accomplish indirectly what it had not accomplished directly. As this court noted, had the creditor contested the confirmation of the plan and appealed from the order confirming it, the case would have been remanded to this court, to be concluded in accordance with *Nobelman.* Having failed to do so, however, and having been put on notice of the modification of the claim sought to be accomplished by debtors' plan, this court held that the creditor could not escape the *res judicata* effect of the order confirming the plan under § 1327(a).

In *Martin,* this court noted that it was familiar with *Simmons, Howard,* and *Linkous.* This court then made the following statement:

> The language employed in those decisions, particularly in *Howard,* is clear, unequivocal and mandatory. It is noted, however, that the notice afforded the creditors in those cases as to the treatment proposed to be given to their claims, was at best wholly inadequate to put them on notice that their rights needed to be protected. Notice was so inadequate in *Linkous* that the decision was grounded in the creditor's constitutional right to due process of law. This court doubts that the same language would have been employed, or even that the same result would have been reached, had the cases involved adequate notice to the creditor of the effect of debtor's proposed plan upon the creditor's claim and lien. In any event, this court, not being bound by them, declines to apply the rule of those cases in the case now before it.

In this court's opinion, as is alluded to above, a secured creditor is entitled to reasonable notice that debtors propose to take an action which would adversely affect the creditor's rights under its claim. If that notice is not given, the creditor may remain on the sidelines, and choose to rely upon its lien for payment of the debt. To hold, however, that the only acceptable means of providing that notice is the filing of an objection to the creditor's timely filed proof of claim, is unduly restrictive. Notice that the debtor intends to value the collateral for the creditor's debt at a lower value than the amount of the debt, and to treat only the value of the collateral as secured and the balance as unsecured, would appear to be all the notice any creditor should be entitled to, whether or not an objection is filed to its proof of claim, or for that matter, whether or not the creditor files a proof of claim. In this case, this court is of the view that such notice was in fact given to, and received by, Lomas, in ample time for it to have taken action to protect its interests before debtors' plan was confirmed.

In *In re Terranova,* 152 B.R. 20 (Bankr. D.Conn.1993), decided less than two months prior to *Nobelman,* the court refers to *Simmons* and *Howard,* and decisions from lower courts, noting that under those decisions, a plan may not affect the validity or amount of a secured claim as to which a proof of claim has been timely filed, in the absence of an objection to that proof of claim. The *Terranova* court states that those cases rely on § 502(a), in that claims are deemed allowed if not objected to, or on the due process argument that a secured creditor must have notice that a debtor intends to reduce or eliminate its secured claim. The court goes on, however, to find that those concerns were not present in the case before it, since the debtor's motion to bifurcate the creditor's claim placed it on notice that the question of valuation of its security was challenged by the debtor. The court then notes that § 506(a) deals with allowed claims, and that under § 502(b), a claim to which an objection has been filed is allowed only after a contested hearing. The court concludes that, in challenging the value of the property securing the debt to the creditor, the debtor has not challenged either the amount or the validity

of the claim, that the claim was therefore deemed allowed, and that a motion seeking to determine value under Rule 3012 is procedurally sufficient. For this conclusion, the court cites *Linkous*. *Terranova*, 152 B.R. at 22, n. 2.

■ Based upon the foregoing, this court finds and concludes that debtors reasonably provided to Lomas, and that Lomas in fact received, notice of debtors' proposed bifurcation and lien-splitting of its claim which was clearly sufficient to inform it that its rights were subject to being adversely affected. Lomas, however, took no action to protect its interests other than to file its proof of claim. It did not contest debtors' § 506(a) motion or object to, appeal from, or otherwise challenge the order entered pursuant to it. It did not object to confirmation of debtors' Chapter 13 plan or appeal from or otherwise challenge the order confirming it.

Lomas' contentions that service of the § 506(a) motion was procedurally incorrect, and that neither debtors' plan nor the order confirming the plan clearly indicated that bifurcation and lien-splitting were contemplated, are simply after-the-fact smoke screens. Lomas received the motion, the plan and all notices. It has never to this day requested that the address shown on the mailing matrix be corrected. Lomas then knew, and now knows, very well, that virtually all Chapter 13 plans filed in the Tenth Circuit during the period prior to *Nobelman* proposed bifurcation and lien-splitting of undersecured mortgage debts. It did not raise in 1991 any of the objections which it raises now because it knew that they would have been unavailing, given the then state of the law.

■ This court is of the view, notwithstanding the foregoing, that debtors are not entitled to judgment quieting title to the property subject to Lomas' mortgage. Lomas has a valid, perfected lien against debtors' property, securing an allowed secured claim of $31,000 as of May 10, 1991. Neither are debtors entitled to an order requiring Lomas to release its mortgage lien on that property, in whole or in part, unless and until the allowed secured claim is paid in full, with interest at the contract rate. A careful reading of Judge TeSelle's order of June 7, 1991, together with the language of debtors' plan, indicates that as to Lomas, the portion of the order requiring release of the lien was to become operative only upon payment in full of the secured claim with interest. In any event, debtors' complaint herein requested an order compelling release of lien only as to American General, as to which this action has been dismissed with prejudice.

Lomas will be ordered to adjust its records to credit all mortgage payments made to it since the May 10, 1991 filing of debtors' petition herein as though the principal balance of the mortgage was $31,000 on that date. Lomas will be ordered to provide to the court, and to file herein, a schedule of such payments reflecting the appropriate allocation of each to principal and interest, concluding with the principal balance remaining unpaid at May 31, 1995.

### Lomas' Unsecured Claim.

■ The court must make a further determination, one which has apparently not been previously addressed by debtors. Lomas asserts, in support of its conclusion that debtors' plan did not bifurcate and lien-split its claim, that the Chapter 13 trustee had made no payments whatever to Lomas on account of its unsecured claim during the pendency of the Chapter 13 plan. The assertion that no payments were made to Lomas is borne out by the trustee's Final Report and Account. The reason, however, for the lack of such payments is not that the trustee interpreted the plan as Lomas would have this court interpret it. The reason is that the trustee quite properly concluded that debtors, not the trustee, were responsible for the payment, outside the plan, of the allowed secured claim of Lomas, and of whatever portion of the allowed unsecured claim the plan proposed to pay as well.

Debtors' plan, and the order confirming the plan, provided that debtors would continue to make ongoing payments on the mortgage debt to Lomas, that debtors would make 57 monthly payments of $415 to the trustee, for a base amount of $23,655, and that the holders of allowed unsecured claims would receive dividends equal to 20% of their

allowed claims. On May 25, 1994, debtors filed their motion to modify their confirmed plan. Asserting that it had been possible to pay in full the secured claim of a secured creditor, American General Finance, in the amount of $6,850, in full through the application of insurance proceeds, debtors proposed to increase the dividend to unsecured creditors from 20% to 38% and to reduce the term of their plan from 57 months to 36 months. The reduction in the plan term by 21 months reduced the base amount to be paid to the trustee by debtors by $8,715, from $23,655 to $14,940. On June 23, 1994, no objection having been filed with regard to the motion, an order was entered modifying the plan as proposed by debtors.

On July 20, 1994, the trustee filed her Final Report and Account, stating that the plan had been completed and providing a list of all claims filed and the amount paid upon each. Secured claims other than that of Lomas were shown as paid in full, with interest, and unsecured claims, other than that of Lomas, were shown as having received dividends through the trustee in accordance with the modified plan. The Lomas claim was shown, in its total amount, as being paid outside the plan, with no amount having been paid by the trustee. The total amount received by the trustee under the plan was shown as $21,016.18, presumably including plan payments and the insurance proceeds used for disposition of the American General Finance secured claim. The total amount paid out by the trustee, for principal and interest on secured claims, dividends on unsecured claims, attorney and trustee fees, was shown as $20,601.18, and the difference, $415, was refunded to debtors.

It should be obvious from the foregoing that although debtors' plan provided that dividends to the holders of allowed unsecured claims would be paid pro rata *by the trustee*, the plan payments provided for by debtors were insufficient to permit any payment by the trustee to Lomas on account of its unsecured claim. It is noted that the order confirming debtors' plan, which was approved by

the trustee and by counsel for debtors, provided specifically that payments to Lomas would be made by debtors outside the plan. Debtors must therefore be found to have assumed responsibility for payment to Lomas not only of the ongoing monthly payments on Lomas' allowed secured claim, but for the dividend on the allowed unsecured claim as well.

Had the trustee believed that she was responsible for any payment to Lomas, she would have seen that the proposed plan payments were insufficient to permit any such payment. Similarly, if she had attempted to pay the dividend on the unsecured portion of that claim on a pro rata basis with other allowed unsecured claims, it would have been obvious that debtors had not provided sufficient funds with which to do so. A relatively simple calculation would have made clear that the amounts proposed to be paid in by debtors were insufficient to permit the trustee to make any payment to Lomas. The plan thus would not have been feasible as proposed, and could not have been confirmed initially, or later modified. *See* §§ 1322(a)(1), 1325(a) and 1329(b). In these circumstances, debtors must be held to have intended to assume responsibility for both the secured and unsecured portions of the Lomas claim.

Debtors do not address Lomas' contentions with regard to the unsecured portion of its claim. It appears that debtors would have the court, and Lomas, believe that Lomas' unsecured claim has somehow magically disappeared in its entirety, even though debtors apparently have made no payments to Lomas with regard to the dividend promised with regard to it, and even though the amounts paid to the trustee clearly were insufficient to have permitted the trustee to make any such payments.

 The discharge of debtors, entered on July 25, 1994, as required by § 1328(a)(1), specifically excepts debts provided for under § 1322(b)(5) and on which the last payment is due after the date on which the final payment under the plan was due.[8]

---

**8.** Section 1322(b)(5) provides that a plan may, "notwithstanding paragraph (2) of this subsection, provide for the curing of any default within

a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last pay-

As has been discussed previously, the order confirming the plan provided for the payment of both the allowed secured claim and the dividend on the allowed unsecured claim of Lomas by debtors, outside the plan, and does not contemplate any payment by the trustee under the plan to Lomas. Further, it was clearly impossible for Lomas to have been paid in full before the date on which the final payment under the plan, originally or as modified, was due. In view of these facts, debtors must be found to have intended that both the secured and the unsecured portions of Lomas claim be provided for under § 1322(b)(5).[9] That being the case, neither the secured nor the unsecured portion of the Lomas claim has been discharged.

Debtors classified all allowed unsecured claims in the same class. In their modified plan, they promise all holders of allowed unsecured claims a dividend of not less than 38%. Under § 1329(b)(2), a modified plan becomes the plan. Lomas is therefore entitled under the plan, as modified, to a dividend equal to 38% of the amount of its allowed unsecured claim of $12,825.03, a total of $4,873.51.[10] Debtors are responsible for the payment of such dividend.

■ It is noted that debtors, by treating the unsecured portion of the Lomas claim under § 1322(b)(5), and by providing for its payment directly and outside the plan, have avoided the payment of the statutory trustee fee of up to 10%, which would have been incurred had the payments been made through the trustee, as were all payments to other holders of allowed unsecured claims. It is noted further that such treatment will permit the payment of the dividend over a longer period than would otherwise be possible.[11]

Given the fact that debtors have afforded themselves these considerable advantages, this court is of the view that it is appropriate that Lomas be provided with some reasonable assurance that the requisite dividend on its allowed unsecured claim will ultimately be paid to it.[12] In addition to insuring that Lomas will receive the promised dividend, it is also believed to be appropriate that provision be made to insure that Lomas' treatment will in fact be equivalent to the treatment received by other holders of allowed unsecured claims, as is required by § 1322(a)(3).[13]

■ Under § 105(a), this court is empowered to fashion appropriate remedies in aid of its jurisdiction and as are necessary to prevent injustice.[14]

■ In order to secure the payment to Lomas of the promised dividend, this court will create a lien securing such dividend, to attach to debtors' residence as of the date hereof and to be subordinate only to Lomas' first mortgage lien. Debtors may pay the

---

ment is due after the date on which the final payment under the plan is due."

9. In this case, debtors were current on their mortgage payments to Lomas when they filed their petition, and there was therefore no default to cure. This fact does not, in this court's view, make § 1322(b)(5) any the less applicable.

10. Section 1322(a)(1) requires that if a plan classifies claims, it must provide the same treatment for each claim within a particular class.

11. Under § 1322(d), the plan may not provide for payments (to the trustee) over a period that is longer than three or, with cause, five years.

12. Without protection in this regard, debtors could pay the balance of Lomas' allowed secured claim, obtain a release of the lien on their property, and refuse to pay the dividend on the allowed unsecured claim committed by their plan. Lomas would at that point be without security for the debt represented by the dividend. Debtors could later attempt to discharge that unsecured debt in its entirety in a subsequent Chapter 7 bankruptcy proceeding, thus circumventing the salutary provisions of Chapter 13.

13. Even if the dividend is ultimately paid, it will have been paid long after it would have been received had the allowed unsecured claim of Lomas been treated in the same manner as were the claims of other holders of allowed unsecured claims.

14. Section 105(a) is, in its entirety as follows: "(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

dividend, with accrued interest, at any time, and when the same has been paid in full, the lien created hereby shall be released of record by Lomas. In the event the dividend, and the accrued interest on it, has not been paid in full prior to debtors' having made all required payments on Lomas' allowed secured claim, Lomas shall release its mortgage lien of record, but debtors shall continue to make monthly payments to Lomas thereafter, in the same amount as are required under the first mortgage loan agreements, until such time as the balance of the dividend, and all accrued interest on it, has been paid in full. The unpaid balance on the dividend shall bear interest from and after July 20, 1994, the date the trustee filed her Final Report and Account, and until paid in full, at the contract interest rate specified in the first mortgage note, which this court finds to be a reasonable market rate of interest. The provision of interest on the amount of the dividend is appropriate in order to insure that Lomas' treatment is equivalent to the treatment of all other holders of allowed unsecured claims, each of whom received the dividend in its entirety prior to the filing of the trustee's Final Report and Account.

### SUMMARY AND CONCLUSION

Summary judgment under Rule 56, Fed. R.Civ.P., made applicable to this proceeding under Rule 7056, Fed.R.Bankr.P., is appropriate if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Based upon the discussion contained herein, this court has found and concluded that there is no genuine issue of material fact and that the respective parties are entitled to judgment as a matter of law, as follows:

1. The order of Judge TeSelle, entered June 7, 1991, determining the value of secured claims and voiding liens, was and is valid and binding, and is not subject to collateral attack by any party in interest at this time.

2. Debtors' Chapter 13 plan, confirmed by order entered August 5, 1991, effectively and with sufficient notice to Lomas of debtors' intention to modify Lomas' claim, bifurcated and provided for lien-splitting with regard to Lomas' first mortgage, dividing its claim, as of the date of filing of debtors' petition herein, May 10, 1991, into an allowed secured claim in the amount of $31,000 and an allowed unsecured claim of $12,825.03.

3. Lomas will be ordered to adjust its records in order to show the principal balance of its first mortgage as $31,000 as of May 10, 1991, to credit all mortgage payments made to it by debtors thereafter to principal and interest, with interest at the contract rate, and to provide to the court and file herein a schedule reflecting such adjustments and credits to and including May 31, 1995.

4. Lomas shall have a lien upon debtors' principal residence, from and after the date hereof, subordinate only to Lomas' first mortgage lien, securing the 38% dividend provided for holders of allowed unsecured claims in the modified plan, in the amount of $4,873.51, to bear interest on the unpaid balance from and after July 20, 1994, until paid in full, at the contract rate of interest provided for in Lomas' first mortgage note. The obligation secured by such lien may be paid in whole or in part at any time, but if unpaid at the time debtor fully retires Lomas' first mortgage, debtors must continue to make monthly payments to Lomas thereafter in the same amount as were theretofore made pursuant to the first mortgage note until the dividend and all accrued interest on it has been paid in full.

Judgment shall be entered forthwith in accordance with the foregoing.

IT IS SO ORDERED.